1
2
3
4
5              IN THE UNITED STATES BANKRUPTCY COURT

6                  FOR THE DISTRICT OF ARIZONA

7

8                                          | Chapter 11

9                                          | Case No. 10-11078-SSC

10    RCC NORTH, LLC,

11                                         | (Not for Publication- Electronic Docketing
                                            | ONLY)
12
                                Debtor.     | MEMORANDUM DECISION
13

14                    I. PRELIMINARY STATEMENT

15            On Monday, July 11, 2011, this Court conducted an emergency hearing on the

16    Emergency Motion of RCC North, LLC (hereinafter "Debtor") For Stay Pending Appeal and

17    Suspension of Chapter 11 Proceedings Or, Alternatively Motion To Extend The Stay for 30 Days

18    To Seek a Stay Pending Appeal From the Appellate Court ("Emergency Motion"). The Debtor

19    provided notice of the Emergency Hearing to U.S. Bank, N.A. as Trustee for the Registered

20    Holders of Merrill Lynch Mortgage Trust 2006-C1 Commercial Mortgage Pass-Through

21    Certificates, Series 2006-C1 ("U.S. Bank") and the United States Trustee. The Court allowed

22    U.S. Bank until Monday, July 11, 2011, 9:00 AM to respond to the Debtor's Emergency Motion.

23    Counsel for the Debtor and U.S. Bank appeared at the hearing.[1]   The Court has jurisdiction over

24    this matter pursuant to 28 U.S.C. §§1334 and 157 (West 2011). To the extent necessary, the

25

26    _____

27    1 The appearances are as noted on the record.

28                                      1

Case 2:10-bk-11078-SSC    Doc 265    Filed 07/12/11    Entered 07/12/11 15:47:45    Desc
                  Main Document         Page 1 of 26

Court has set forth its findings of fact and conclusions of law pursuant to Rule 7052, Rules of Bankruptcy Procedure.

## II.  FACTUAL FINDINGS

The Debtor filed its Chapter 11 petition on April 15, 2010,[2] and owns and operates two Class "A" office buildings located at 15333 and 15111 North Pima Road, Scottsdale, Arizona ("Property").[3]  The Debtor's operations consist, *inter alia,* of leasing the space available in its office buildings to tenants, and providing tenant improvements for those tenants.  When the Debtor filed its Schedules and Statement of Financial Affairs, it listed U.S. Bank, as the Trustee for certain certificate holders, as its largest secured creditor in the principal amount of $57,495,000.[4]  Although the Debtor listed other creditors, both secured and unsecured, their claims, in comparison, were *de minimus.*[5]

### A.  Motions for Relief from Stay Hearings

Early in the case, U.S. Bank moved for relief from the automatic stay.[6]  U.S. Bank questioned whether its cash collateral should be utilized by the Debtor, because the Debtor could not provide adequate protection to U.S. Bank for said use, and fundamentally, U.S. Bank questioned whether the Debtor could ever  propose a feasible plan of reorganization that could be confirmed by the Court.  The Court conducted a preliminary hearing on the Motion for Relief from the Automatic Stay on July 7, 2010.  At that hearing, the Court entered the following minute entry order:

2 The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, as amended, ("BAPCPA")(Pub.L.No. 109-8, §1501(b)(1), 119 Stat. 23, 216)  is applicable to this case.

3 The Debtor refers to the Pima Road office buildings as Phase I (15222 North Pima Road) and Phase II (15111 North Pima Road), respectively, located in the Raintree Corporate Center.  See Debtor's Emergency Motion at 3, Lines 3-5.

4 See Docket Entry No. 27, Schedule A.

5 Id., Schedules A and D.

6 See Docket Entry No. 48.

2

1
2
3

> Mr. Lorenzen states that there is no equity in the property, and does not feel that reorganization is possible. Mr. Roth states that the debtor is working with an investor group and would like the opportunity to file a plan by July 14. COURT: IT IS ORDERED CONTINUING THIS HEARING TO JULY 20, 2010 AT 1:30 P.M.[7]

4

Rather than set an immediate final hearing, U.S. Bank agreed to have the final

5

hearing on its motion for relief from the automatic stay heard with the Debtor's hearing on

6

confirmation of its plan. The motion for relief from stay would ride the calendar as a

7

preliminary hearing until the confirmation hearing of the Debtor's plan was to commence. At

8

that point, U.S. Bank's motion for relief from stay would become a final hearing. As a result, it

9

was understood by the Debtor, U.S. Bank, and the Court that if the Debtor did not confirm its

10

plan, the automatic stay would be vacated.[8]

11

However, US Bank soon became concerned that the Debtor did not have

12

sufficient cash on hand to pay critical expenses of operation. Specifically, on October 15, 2010,

13

U.S. Bank filed an emergency motion for relief from the automatic stay because the Debtor was

14

not impounding any funds for the payment of postpetition real property taxes on the Debtor's

15

Property, thereby further eroding any value in the Property that served as security for the US

16

Bank obligation.[9] The Court conducted a hearing on this emergency motion on October 20,

17

2010. At that hearing, after argument of counsel for the Debtor and US Bank, the Court entered

18

the following minute entry order:

19
20
21
22

> Mr. Lorenzen states that the debtor has not paid the property taxes, and that there is a lack of adequate protection. He notes that the taxes were due in October and the debtor is refusing to pay the taxes. Mr. Hebert states that Mr. Lorenzen did not comply with local rules in setting this expedited hearing. He further notes that both the plan and disclosure [statement] make allowance for the payment of property taxes and submits exhibit A to be marked. He notes no emergency exists and the motion should be denied. COURT: THE COURT NOTES THAT THERE

23
24

7 See Docket Entry No. 65.

25
26

8 On July 20, 2010, the Court entered the minute entry order concerning the modification of the automatic stay to allow the Debtor to proceed toward confirmation, with the preliminary hearing to ride the court's calendar. Docket entry No. 72.

27

9 See Docket Entry No. 94.

28

3

**HAS NOT BEEN A CHANGE IN CIRCUMSTANCES, AND THAT THERE IS NO EMERGENCY. IT IS ORDERED DENYING THE MOTION. THE COURT FURTHER NOTES THAT THE TAXES ARE IN PLACE IN THE PLAN AND DIRECTS THE DEBTOR TO HAVE THEIR TAX MONEY ON HAND.[10]**

By February 2011, U.S. Bank was again concerned about the Debtor's failure to pay real estate taxes on the Property, and the concomitant erosion of the remaining equity in the Property which serves as part of the collateral of U.S. Bank. The Court and counsel for U.S. Bank and the Debtor discussed the issue of adequate protection and the payment of real estate taxes at the hearing on February 3, 2011. The Court and the parties engaged in the following exchange:

> **MR. LORENZEN:** Thank you, Your Honor. I did speak to the engineers of Cavan Management who came here today. I don't know whether we'll be able to reach an agreement. I don't think Mr. Hebert was necessarily implying that was a representation on our part. I need to talk to my client, I need to find out what, you know, they've -- we made our legal points in the objection. And so if they want to have a hearing on the 22nd, we should set it for hearing and we'll continue to try and work. I don't know if there will be an agreement or not.
>
> As far as the taxes are concerned, it sounds like -- I forget whether it was the line from Wimpy, "I'll gladly pay you Tuesday for a hamburger today," but Mr. Hebert's saying we think we might have the money in April doesn't change the fact that these taxes accrue at about $70,000 every month. They will be due in April. There's no doubt about that. And those taxes that are accruing but are not yet past due impair my client's lien. There's no doubt about that. We're entitled to adequate protection, and the budget that they've submitted shows that we're not being protected.
>
> Now if you peel out the capital expenses, they're not operating at a loss. So that's for the 22nd, I guess. But the property taxes unquestionably are not being covered. So when we went through this last time there were a series of hearings. And you said have the money, then the next hearing, have the money, the next hearing, have the money. And so I maintain that we're entitled to adequate protection. They're not offering adequate protection. But if the Court is inclined to do anything to bridge the gap a little bit, I would say please don't approve a 90-day budget. If we're going to be back here on the 22nd dealing with this other issue, let's see if they've got the tax money as a precaution.
>
> **THE COURT:** Are you willing to at least give the debtor a -- what I'll call an interim or emergency budget up to February 22nd?
>
> **MR. LORENZEN:** Right. The operating expenses, not the capital expenditures. And if they can get the money, we're entitled to adequate protection. And they're not covering us on these taxes, so that's what I was proposing.
>
> **MR. HEBERT:** We didn't have a lot of hearing last time. I think we had two hearings. . . .We now [sic] what your position is on this issue. We dealt with it before. So I stand here saying to my clients, as you might imagine,

---

10 Docket Entry No. 103.

4

we have to make sure we keep this going. Remember we have a case where the plan's been filed in a timely fashion. We actually are going through getting ready for confirmation now.

**THE COURT:** Eight million dollars in commitments.

**MR. HEBERT:** Right. I'm . . .and, you know, a debtor in this time and doing these things is . . .

We know what we have to do to get to confirmation of a plan here. But on the other hand, Your Honor, cash flow is, as you know dear to every debtor in a Chapter 11...[11]

And later at the February 3, 2011 hearing:

**MR. HEBERT:** On the taxes, as Richard [Lorenzen, counsel for U.S. Bank] said, you know, we're operating a pretty close to breakeven or above breakeven. We need an opportunity to go back and address the accumulation of cash or find another way to find the cash to pay the taxes by April. And it's just the lot of a debtor to not necessarily be able to put $70,000 aside, especially, you know, when we've gone out already and put 400,000 up just about a month ago.

We've got $8 million in commitments. The lender isn't suffering any great harm between now and April . . .I mean we had a disagreement about whether we had to or not on the taxes. You ordered that we did and so we did. We now have that under our belt. We know what your position is so we're going to do it. But we don't have the ability today to set aside $70,000 every month. Will we know more in a month? Probably.[12]

Continuing on at the February 3, 2011 hearing:

**THE COURT:** Well, since we are getting to confirmation, I guess my question to you is, you know, bigger picture. What is the debtor going to do long-term once the plan is confirmed - - - I'll be optimistic - - - to make sure that all of these plan payment are made and to make sure that all of the capital improvements are done, and to make sure that these taxes, you know, quite frankly, are escrowed on a monthly basis?

**MR. HEBERT:** No problem. The answer's real simple, Judge. We got commitments for $ 8 million.[13]

At the initial hearing on confirmation and the commencement of the contested

hearing on confirmation of the Debtor's plan, U.S. Bank's Motion for Relief from

the Stay was before the Court as a final hearing. The Court will discuss hereinafter what

transpired at the contested confirmation hearing which caused the Court to vacate the stay. It

---

11 February 3, 2011 hearing transcript, Docket Entry No. 164, pp.4, lines 14-25, p. 5, lines 1-25, p.6, lines 1-17.

12 Id., at p.7, lines 5-11, and 12-13, and 19-24.

13 Id. at p. 8, lines 14-23.

5

should also be noted, contrary to the assertions of the Debtor, that the Court did set forth its findings of fact and conclusions of law as to why U.S. Bank's Motion should be granted in a subsequent order vacating the automatic stay following the cessation of the contested confirmation hearing.[14]

## B.  The Debtor's Winding Road to Confirmation

At recent hearings, Debtor's counsel has consistently asserted that the Debtor has proceeded as promptly as possible, given the Court's calendar, toward confirmation.  The record in the case reflects more of a winding road.  The Debtor filed its Chapter 11 petition on April 15, 2010.  The Debtor filed its first plan of reorganization and disclosure statement on July 14, 2010.[15] A hearing on the disclosure statement was held on September 2, 2010.[16] An amended plan and disclosure statement were filed on October 12, 2010.  Although the Debtor initially filed its plan within 120 days of the filing of its petition to preclude any other creditor or interested party from filing a competing plan, in order to maintain the Debtor's exclusive right to obtain acceptances to the plan, the Debtor had to file a separate motion to extend that second exclusivity period concerning obtaining acceptances.[17]  The Debtor filed a motion to extend the second exclusivity period on October 12, 2010, which was granted by the Court on November 17, 2010.[18] The Debtor was provided with additional time to obtain acceptances to its amended plan and disclosure statement and to obtain funding from its investors to confirm a proposed plan.  When the Debtor's plan and disclosure statement were filed on July 14, 2010, the funding

---

14 The Debtor believes that the Court should have set forth all of its findings of fact and conclusions of law on the record at the time it stopped the confirmation hearing.  There is no such requirement.  In fact, Local Rule 9010-1(d) provides that a Court may have as long as 60 days, after a hearing, to render its decision on a particular matter.

15 Docket Entry No. 66 and 67.

16 Docket Entry No.79.

17 Compare 11 U.S.C. §1121(b), (c)(2) with §1121(c)(3)(West 2011).

18 Docket Entry Nos. 86 and 111.

6

from investors was necessary for two reasons: (1) to show that the plan was feasible, allowing the Debtor to make payment to its creditors under its plan and continue with its operations, and (2) to provide new, substantial value, in cash, to ensure that the new value contribution was reasonably equivalent to the value being received.

Ultimately the Debtor was unable to obtain acceptances to its plan within the extended period of time granted by the Court, and the Debtor's exclusive right to obtain acceptances and proceed toward confirmation ended. U.S. Bank filed its plan of reorganization and its disclosure statement on March 10, 2011, and after hearing on notice to creditors, the Court approved the U.S. Bank disclosure statement on March 24, 2011. The hearing on confirmation of the U.S. Bank plan is scheduled for July 27, 2011. The Court will discuss hereinafter the competing plans of the Debtor and U.S. Bank.

In January 2011, at the request of U.S. Bank, the Court conducted a hearing concerning whether confirmation of the Debtor's plan should be denied as a matter of law. Memoranda of law were submitted by U.S. Bank and the Debtor in support of their respective positions. The Court concluded, after argument of the parties, that *any* change in the legal, equitable, and contractual rights of a claim or interest holder was impairment which entitled the claim or interest holder to vote, either accepting or rejecting the Debtor's plan.[19] However, the Court also determined that impairment was a separate issue from whether the Debtor proposed its plan in good faith, and stated that it would allow U.S. Bank to proceed at a contested confirmation hearing on the good faith issue.[20] The Court further concluded, as a matter of law, that the Debtor could not separately classify administrative expenses as "classes of claims" for purposes of whether the Debtor had an impaired consenting class.[21]

---

19 11 U.S.C. §§1124, 1126(f), 1126(a)(West 2011); In re L & J Anaheim, 995 F.2d 940 (9th Cir. 1993).

20 11 U.S.C. §1129(a)(3)(West 2011).

21 11 U.S.C. §§1123(a)(1), 507(a)(2), 503(b)(West 2011).

7

U.S. Bank also challenged, as a matter of law, whether the Debtor could place Larson Allen, the Debtor's prepetition accountant, in a separate class as a secured creditor. U.S. Bank could envision no business justification for the separate classification, and questioned whether the Debtor was manipulating its classes, known in bankruptcy case law as "gerrymandering," to obtain the consent of an impaired class. While acknowledging the creditor's status as, effectively, a secured creditor,[22] U.S. Bank focused on the fact that the secured creditor's prepetition claim could easily be paid by the prepetition retainer that it had received.[23] Although the Court noted its reservations about the classification, it concluded, at the time, that the matter could not be determined as a matter of law.[24]

On May 4, 2011, the Court conducted the initial hearing on confirmation of the Debtor's plan, as amended, after the balloting period for acceptances and rejections to the plan and the time period to object to confirmation of the plan had expired.[25] U.S. Bank's request that the automatic stay be vacated was also riding the confirmation calendar. At the commencement of the hearing, the Court inquired whether the Debtor had $8 million on deposit, as required under its plan. At that time, the Debtor stated that it had not raised the requisite cash to proceed

---

22 11 U.S.C. §§553(a), 506(a)(West 2011).

23 Larson Allen was owed the prepetition sum of $3,941.56 by the Debtor, and held a prepetition retainer from the Debtor in the amount of $25,000. As a side note, since the professional held a prepetition retainer that had not been set off against a prepetition debt, it could not represent the Debtor in its Chapter 11 proceeding, because it was not disinterested. 11 U.S.C. §§327(a), 101(14) (West 2011).

24 Docket Entry No. 176; Minute Entry from February 25, 2011.

25 Pursuant to the Court's usual procedures, as set forth on the Court's website, if an objection to confirmation is filed to a chapter 11 debtor's plan, the Court utilizes the initial hearing on confirmation to set up a schedule to resolve the objection. Bankruptcy Rules 9014, 7016. However, if no objection to confirmation is filed, the Court proceeds, at the initial hearing, with whether the debtor may confirm its plan under Section 1129(a) and/or 1129(b) of the Bankruptcy Code; and the debtor, if an entity, must have its principal present to testify, or debtor's counsel may file a declaration or affidavit in support of confirmation. The Court has an independent duty to ensure that the debtor is able to meet the requirements of Section 1129 to confirm its plan. In re Acequia, 787 F.2d 1352 (9th Cir. 1986).

8

with confirmation.  Rather than immediately vacate the automatic stay, the Court granted the

Debtor additional time to raise the capital necessary to proceed with the contested confirmation

hearing.  The Debtor requested, and the Court ultimately granted, 45 days to raise the funds from

its investors.  The Court then set the commencement of the contested confirmation hearing on

the Debtor's plan for June 27, 2011 at 10:00 AM.  During the course of the May 4, 2011 hearing

(Transcript at Docket Entry No. 231), the Court discussed with Debtor's counsel the requirement

that the $8 million be on deposit to proceed with the contested confirmation hearing.  The

following colloquy between the Court and Debtor's counsel reflects the importance of the

Debtor having the funding on deposit, and the Debtor's *agreement* that the funding would be on

deposit, or the Debtor would not proceed with the confirmation of its plan, and the automatic

stay would be vacated to allow U.S. Bank to proceed with its rights and remedies under state

law:

> **MR. HEBERT**: . . . .  Yes, we have -- we don't have the whole $8 million, but we brought this issue up before, Judge, and we set it. In fact, you set one of the dates for us to have the money in deposit, or one of the deadlines, in case we didn't have it, so we could go to our outside sources. And what's happening here is, we have $2 million on deposit now, we expect to get about $3.6 million in the next week or 10 days, if we don't make the 8-, we're already starting to deal with alternative investors so that we can make the 8-. I mean, that just makes common sense.
>
> So, as I said, I just totally disagree. We said we'd have the money on deposit on the day set for confirmation.  That's what the Court ordered and that's what we're shooting for right now. It isn't that anybody has fooled this Court whatsoever, not the -- not the case, Your Honor. As I said, the commitment letters were filed with the Court and everybody has seen them and knows what they say kind of thing.
>
> So, you know, what we ought do is, move toward confirmation. If my client doesn't have the money -- and I'll avow to the Court right now, if my client says, Jack, I'm not going to have the money, I'll inform the Court immediately, okay? But we're heading toward a date that the Court set. (pp. 11, lines 21-25, p. 12, lines 1-17).
>
> \* \* \* \* \* \* \*
>
> **MR. HEBERT**: ....  All's (sic) we want is the opportunity to meet the deadline the Court set for raising the money and we're heading in that direction. And, as I said, I'll avow to the Court that if it gets to the point where my client says, I'm not going to be able to raise the money, I will immediately file a pleading with the Court and notify Mr. Lorenzen that we're not going to be able to do it. But right now, we are still confident that we're going to have the $8 million by confirmation. (pp. 12, lines 24-25, p. 13, lines 1-6).

9

* * * * * * *

**THE COURT**: No, I'm not -- no, here -- and I've said it before, I've been very careful about this: We had the discussion, and I know you remember it, I remember it, about the initial hearing on confirmation --
**MR. HEBERT**: I remember that.
**THE COURT**: -- and whether the deposit had to be made, and we had a disagreement. And I expressed my concern and I went down the road with you and said, fine, it's a contested –
**MR. HEBERT**: I agree.
**THE COURT**: -- hearing. You don't need to have your deposit. But, but, I also said, at the time, we need to move this down the road. We'll have the contested hearing on confirmation and, at that initial hearing, the deposit needs to be made.
**MR. HEBERT**: I remember all that.
**THE COURT**: Pardon?
**MR. HEBERT**: I remember all that. (pp. 17, lines 20-25, p. 18, lines 1-12).

* * * * * * *

**THE COURT**: As far as where we are with the letters, Mr. Lorenzen, I would agree that everyone knew, basically, how those letters were set up for quite some time. To me, the critical issue is whether they're going to get the money on hand.
**MR. LORENZEN**: Right.
**THE COURT**: And from my standpoint, I need to start a contested hearing on confirmation with Mr. Hebert going to the podium and saying, I have the $8 million on hand. Here's how it is on hand. If he can't say that, confirmation is denied and Mr. Lorenzen's stay is vacated. (pp. 25, lines 16-25, p. 26, line 1).

* * * * * * *

**MR. HEBERT**: Not -- well, I'll tell the Court right now, Richard, that I will agree that the Court can set an initial contested confirmation hearing during that week and you don't have to set aside the three days, which is really just another way of saying, that's the deadline I'm looking for as a reasonable basis to get my money in. (p. 27, lines 10-15).

* * * * * * *

**THE COURT:** Easy. But to be clear, Mr. Hebert, you're going to start off that hearing and, I'm making it clear, you need to say the $8 million is on hand it's been deposited. If it's not it's going to be a short trial.
**MR. HEBERT**: You've made that so clear that even at my advanced age I can

remember that one. (May 4, 2011 completed hearing transcript, Adversary 10-ap-1209 Docket Entry No. 33, p. 32, lines 10-15).

On June 27, 2011, the Court commenced the contested hearing on confirmation of

the Debtor's plan. Given the previous avowals of Debtor's counsel, the Court initially inquired

if the Debtor had the requisite funds on deposit. Debtor's counsel answered in the affirmative.

His first witness, Ms. Lynne Russell, from Stewart Title and Trust of Phoenix, Inc. ("Stewart

10

Title"), would testify to the funds on deposit.[26]  However, Ms. Russell,  who was subject to cross examination, provided troubling testimony: (1) there were two escrow accounts, one of which had been recently opened; (2) she did not know why there were two accounts; and (3) the two accounts only had $7,227,345.85 on deposit.[27]  The Debtor called a second witness, Mr. Gary

26 The transcript reflects that at the start of the contested hearing on confirmation, there was the following exchange:
      Mr. Hebert: Well, I get to go first.
      The Court: Well---
      Mr. Lorenzen: Go ahead.
      The Court: Absolutely.  You've now decided you want to present opening argument, go for it.
      Mr. Hebert: I – if both – I would have been happy to waive if both counsel want to waive, but I ---
      The Court: Go ahead, please.
      Mr. Hebert: Okay.  Your Honor, this is the hearing on confirmation of the debtor's plan of reorganization.  There's only two issues before the Court at today's hearing regarding confirmation.  One is feasibility and one is good faith, that's it.  Both Factually intensive issues.
      The parties have stipulated to value on the real estate and improvements to the building.  The interest rate has been stipulated to and there is a stipulation in the joint pretrial statement on the record that this plan satisfied Section 1129(a)(8)---
      Mr. Rudd: Ten.
      Mr. Hebert:  —(10), that there's an impaired class voting
yes.  So under the circumstances the debtor's burden is to simply provide the necessary proofs under 1129(b) with regard to cram down.
      The Court: You need to meet all of the requirements under 1129(a).
      Mr. Hebert: All of the requirements are either stipulated to --
      The Court: Do you have –does the debtor have the money?
      Mr. Hebert: It's in the —yes.
      The Court: Okay.
      Mr. Hebert: The –that's what I was going to say next.
June 27, 2011 Transcript at p. 11, and p.12, Lines 1-8.

27 See Exhibits 44, 45, 46, and 46A.  Escrow No. 10100878 had $4,277,345.85 initially on deposit.  However, an additional $200,000 was received in that Escrow just prior to the commencement of the contested confirmation hearing.  Escrow No. 11100513, which was opened in June 2011, and included funds for both the Debtor and a related debtor, RCC South, held aggregate funds in the amount of $9,750,000 at the start of the hearing, of which $2,750,000, was potentially to be distributed to the Debtor.  However, as will be discussed hereinafter, the funds in Escrow No. 11100513 could be distributed to the Debtor or to RCC South, at the election of the investor.  Thus, when the Court started the hearing on June 27, 2011,

Burton who confirmed the opening of the second escrow account in June 2011, and the fact that the Debtor did not have $8 million on deposit at the commencement of the hearing. U.S. Bank's counsel stated his concern that a second escrow account had been opened in June 2011 and that he believed that the escrow funds had not been committed to confirmation of the Debtor's plan. In essence, the Debtor had provided too many conditions precedent to its investors, and the investors could be withdrawn the funds at any time.

The Court concludes that the Debtor failed to comply with the requirement that it have $8 million on deposit at the commencement of the contested confirmation hearing, as agreed to by the Debtor and Debtor's counsel, and as required by the Court. As a result, the Court vacated the automatic stay to allow U.S. Bank to proceed with its rights and remedies under state law.

However, the Court also concludes that the Debtor's opening of a second account on the eve of a contested confirmation hearing substantially affected the disclosure that the Debtor had previously provided to U.S. Bank and its creditors and precluded confirmation of the Debtor's plan. A careful analysis of the escrow agreements confirms this conclusion.

Escrow No. 10100878 was opened by Stewart Title in December 2010.[28] Raintree Corporate Center Holdings, LLC ("RCCH"), the Debtor's sole member, was the other party to the Escrow Agreement. Paragraph 1.2 of the Agreement stated:

> RCCH is an existing limited company into which RCCH believes each Depositor[29] will invest and thereby become a member or increase their existing membership interest in RCCH, or alternatively, Depositors will invest and

---

the funds on deposit, but subject to new terms and conditions, were $4,277,345.85 plus $200,000 plus $2,750,000 or the aggregate amount of $7,227,345.85. The Debtor also wanted to include the funds on deposit in the Debtor in Possession tax account in the amount of $435,000. However, even including the tax account funds, the Debtor only had $7,662,345 on hand at the commencement of the hearing.

28 Exhibit 44.

29 Id. In the Agreement, Depositor is defined as "each of the individuals and entities executing this Agreement..."

12

become members in either [the Debtor] ("RCN") which is an existing limited liability company, or Newco North Raintree, LLC, a to be formed limited liability company ("Newco"). If Newco is utilized for the purposes described above, it is contemplated that Newco will be managed by RCCH and become an additional member in RCN. Presently, RCCH is the sole member of RCN. Collectively RCCH, RCN, and Newco are herein referred to as the "Company."

The Agreement described only the Property owned by the Debtor, and discussed only the Chapter 11 proceedings of this Debtor.[30] The Agreement also contained a series of steps or conditions precedent that needed to be followed prior to the Depositors having to provide funding to the Debtor. Those steps may be described as follows:

1. The Depositor needed to execute the Operating Agreement and the Subscription Agreement, described as the "Formation Documents."

2. The Formation Documents were not effective until the Depositors had reviewed and approved (i) the Formation Documents and (ii) Debtor's final Plan as confirmed by the U.S. bankruptcy court.

3. A final non-appealable order confirming the Debtor's Plan had to be entered by the bankruptcy court, and a copy thereof furnished to the Depositors.

4. RCCH needed to identify those Depositors who had executed the Subscription Agreement and had approved the Final Plan of the Debtor and instruct Stewart Title to disburse the funds to the Company.

5. All of the steps were to occur prior to June 30, 2011, which date would be automatically extended "at least 30 days to review the final plan of reorganization or other final order as entered by the U.S. bankruptcy court concerning the proposed reorganization of [the Debtor]."[31]

However, the Debtor also presented a substantially different Escrow Agreement at the commencement of the contested confirmation hearing. The Court had not seen this Agreement before, and U.S. Bank stated its unfamiliarity with the Agreement.[32] The Escrow

30 Id. See, for instance, Paragraph 1.3 of the Escrow Agreement.

31 Id. The specific quote is from Paragraph 4.5; the steps are set forth in Paragraphs 4.1, 4.2, 4.3, 4.4, and 4.5.

32 Exhibit 45. The testimony reflected that the Escrow Agreement had been entered into in Mid-June 2011 just prior to the start of the contested confirmation hearing on June 27, 2011. The Debtor had not disclosed this Agreement to the Court or to its creditors or other interested parties.

13

Agreement referred to the establishment of Escrow No. 1100513, which replaced and superceded a prior agreement dated May 23, 2011.[33]  Of critical importance is what the Debtor tried to accomplish with this Agreement, without disclosure to the creditors or interested parties.  For the first time, the Debtor now discussed a related Chapter 11 proceeding of RCC South.  RCCH stated that it was the sole member of RCC North, the Debtor, and RCC South.  The Agreement then described the assets owned by RCC South, when RCC South filed its Chapter 11 proceeding, and the separate capital requirements of RCC South to confirm its plan of reorganization.[34]  The Agreement, referring to RCC South as "RCS" then stated:

> It is contemplated that $7 million of the Escrow (the "RCS Portion") will be utilized to satisfy the new value requirements of the RCS Plan and the balance of the Escrow ($2.75 million, the "RCN Portion"), together with the escrowed funds in the Separate Escrow[35] will be utilized to satisfy the new value requirements of the RCN Plan.[36]

The new Escrow Agreement also required similar conditions precedent as to what was set forth in the RCC North Escrow with important changes.

> 1.  Although similar Formation Documents needed to be signed by the Depositors, the date for the Formation Documents to be executed was extended to August 31, 2011.

> 2.  A new provision stated that if the Court dismissed or denied confirmation of the the Debtor's Plan *and/or* the RCC South's Plan by August 31, 2011, the Depositors could request a return of their investment.

> 3.  The Agreement also contemplated that if the funds in the Separate Escrow and the new Escrow exceeded $15 million, the amount in excess would be returned to the two initial Depositors.

> 4.  The Agreement also now stated that in the event the final Plans of the Debtor and RCC South became effective on different dates, the Depositors could elect to provide their funding for either the Debtor or RCC South.

---

33 Id., Paragraph 1.1  The prior agreement dated May 23, 2011 was also not disclosed to this Court or to creditors and interested parties.

34 Id., Paragraphs 1.2 and 1.3.

35 Id., Paragraph 1.3 states that the "Separate Escrow" is defined as the previously established escrow account by the Debtor with Stewart Title, which is described in Exhibit 44.

36 Id., at the end of the penultimate paragraph in Paragraph 1.3.

14

5.  August 31, 2011 was the proposed date for the conditions precedent to be removed, with an automatic extension date to September 30, 2011.

6.  Importantly, the Agreement also stated that if the conditions precedent were not removed by August 31, 2011, and the date was automatically extended to September 30, 2011, the date would not be "extended beyond September 30, 2011 . ..unless a further extension [was] approved in writing by the Depositors."[37]

Now the investors were to be provided with plans from the RCC North and the RCC South cases, and the investors were to review the terms of the "final plans."  The investors could elect whether to place their funds in RCC North or RCC South, and there was an outside date for the *Debtors* to confirm their plans, or the funds would be returned to the investors unless the investors agreed in writing to a further extension of time.  Not only had the Debtor not disclosed this information to the Court or to creditors and interested parties, but the related Debtor, RCC South, had apparently not disclosed the information, in its disclosure statement, to its principal creditor, SFI Belmont LLC, as successor in interest to iStar FM Loans LLC or to creditors and interested parties in its case.[38]  At no point did the Debtor request  administrative or substantive consolidation of the RCC North and RCC South cases.

At the commencement of the June 27, 2011 contested confirmation hearing, U.S. Bank also questioned whether the Debtor had made a material modification to its plan by supplying, for the first time, the new Stipulation that the Debtor had just entered into with Eye Level Holdings, LLC.  The Stipulation was just filed with the Court and had not been noticed to creditors and interested parties.  The Stipulation provided, for the first time, that the Debtor would reject its lease with Eye Level Holdings, that Eye Level Holdings would provide the Debtor with a promissory note for the postpetition rent that Eye Level Holdings owed to the Debtor, and the Debtor would allow the unsecured claim of Eye Level Holdings as a

---

37 Id., at Paragraph 4.5 as to the quoted language; also see Paragraphs 4.1, 4.2, 4.3, 4.4, and 4.5 as to the remaining changes concerning the funds on deposit.

38 *See* Docket Entry Nos. 144, 145, and 146. Transfer of claim from iStar FM Loans LLC to SFI Belmont LLC and Notice of Appearance on behalf of SFI Belmont LLC.

15

reimbursement for the Debtor's failure to provide tenant improvements to Eye Level Holdings as to current and additional space located at the Debtor's Property. This failure to disclose to creditors and interested parties its second amended stipulation with Eye Level Holdings, coupled with (i) the Debtor's failure to disclose that it had modified and consolidated its funding in two separate Chapter 11 proceedings, and (ii) the Debtor's failure to raise $8 million as it agreed, warranted denial of confirmation of the Debtor's plan and granting of U.S. Bank's request that the automatic stay be vacated. The Debtor attempts to down-play its disclosure issues by stating that the *proposed* terms as to the second stipulation were set forth in the joint pretrial statement entered into with U.S. Bank for purposes of the June 27, 2011 contested confirmation hearing. However, the Debtor concedes that it was still negotiating with Eye Level Holdings and had executed the second stipulation just prior to the commencement of the contested confirmation hearing. If the negotiations were as contested as the Debtor avows, how can the Debtor also assume that *any* agreement that it entered into with Eye Level Holdings would not substantially change from the one set forth in the joint pretrial statement? The Court concludes that because the Debtor had not concluded its negotiations with Eye Level Holdings until the commencement of the contest confirmation hearing, U.S. Bank had legitimate reasons to question whether the Debtor had entered into a material modification of the its plan which was not properly disclosed to the Debtor's creditors and interested parties..

At no point did the Debtor notify the Court, U.S. Bank, or other creditors and interested parties that it had modified the requirement to provide $8 million in funding for its plan to be feasible and for the Debtor to satisfy the new value exception to allow its investors to retain their interests in the Debtor. Even if the Court were to consider the Debtor's subsequent offer of proof as to the funds that it had on hand in its various deposit or Escrow Accounts for confirmation purposes, as of June 27, 2011, the maximum amount the various accounts held was $7,662,345.85, consisting of $7,227,345.85 in the Escrow Accounts, and the sum of $435,000 in

16

the Debtor in Possession tax account.[39]  The Debtor had not raised the requisite $8 million.

Moreover, the Debtor never presented any documentation prior to the commencement of the

contested confirmation hearing that it had amended or altered its requirement that it required $8

million to confirm its plan.  Indeed even as late as Mid-June, 2011, when the sole member of the

Debtor entered into the second Escrow concerning funding for both the RCC North and the RCC

South cases, the Debtor stated, in that Agreement,  that it needed $8 million, in the RCC North

case, for feasibility and new value exception purposes.

   Moreover, the Court concludes that there is at least one critical issue remaining

as to whether the Debtor may ever confirm its plan.  At the time of the contested confirmation

hearing, the Debtor improperly described the matter as simply a "legal issue."  The Court

disagrees.  Although U.S. Bank stipulated in the joint pretrial statement that the Debtor had an

impaired consenting class, for purposes of Section 1129(a)(10), U.S. Bank reserved its right to

challenge whether the Debtor had engaged in gerrymandering of its various classes to obtain the

acceptance of an impaired consenting class.  U.S. Bank's argument concerning whether the

Debtor was proceeding in good faith, as separately required under Section 1129(a)(3), was

preserved.[40]  Thus, the Debtor's statement that U.S. Bank had somehow waived, as a matter of

law, its rights to pursue its issue that the Debtor had proceeded in bad faith as to its classification

of certain claims, or gerrymandering, was overruled by the Court at the commencement of the

contested confirmation hearing.  U.S. Bank's substantial issues as to the good faith classification

---

39 The Debtor attempts in its offer of proof to state what it had on hand as of June 30, 2011.
However, the offer of proof is after the agreed upon date for the funding, and the offer of proof is
inconsistent with an Exhibit admitted in evidence.  Exhibit 45 states that if the funding received
from Depositors, or investors, exceeds $15,000,000, then the amount in excess "shall be
immediately returned on a *pro rata* basis to the two initial Depositors hereunder, so long as the
Deposits remaining available hereunder continue to satisfy both the [RCC South] Portion and
any then applicable [RCC North] Portion escrow Deposit requirements after taking into
consideration the total funds then deposited in the Separate Escrow."  Exhibit 45, Paragraph 4.1,
end of second full paragraph therein.

40 Docket Entry No. 222, Page 16, Paragraph 2.

17

of one or more of the impaired classes posed substantial factual and legal issues as to whether the Debtor's plan could ever be confirmed.

## C.  The Battle of the Investors

As previously noted, U.S. Bank has been proceeding on a separate path toward confirmation of its plan.  The Court terminated the Debtor's exclusive right to obtain acceptances to its plan of reorganization, allowing U.S. Bank to propose a separate plan, have its disclosure statement approved, and have a hearing set on confirmation of its plan for July 27, 2011.  U.S. Bank serves as the Trustee concerning numerous certificate holders.  These certificate holders either provided funding to the Debtor, or they are successors in interest to those parties.  In essence, they too are investors, and they provided the principal amount of $57,385,721 to the Debtor, with accruing interest thereon and late fees, for an aggregate amount owed to the certificate holders in the amount of $60,344,948.04 as of the filing of the Debtor's petition.[41]  The value of the Debtor's real property and the improvements thereon, constituting U.S. Bank's collateral, had a value of no less than $30,500,000 as of the commencement of the contested hearing on confirmation.[42]  Just as the investors of the Debtor have provided new monies so that they may confirm their plan, the certificate holders have provided new monies  to defend their interests in this Chapter 11 proceeding, and to provide new monies to confirm their plan of reorganization.  From the Court's standpoint, given the termination of the Debtor's exclusivity period to obtain acceptances to the confirmation of its plan, the certificate holders, as represented by U.S. Bank, are entitled to proceed toward confirmation of their plan to protect and maximize their investments.  Moreover, U.S. Bank has not impaired any of its creditors; therefore, it does not require any creditor to accept its plan.[43]  U.S. Bank intends to proceed

---

41  Exhibit 5.  US. Bank has previously described the amount due and owing to the certificate holders as being in excess of $70 million.

42 Exhibit KK.

43 11 U.S.C. §1126(f)(West 2011).

18

toward confirmation of its plan on July 27, 2011, under Section 1129(a).

### III. LEGAL DISCUSSION

#### A.  The Stay Pending Appeal

In determining whether the Debtor is entitled to a stay pending appeal, the Court utilizes the four factors as set forth in In re Wymer, 5 B.R. 802 (9th Cir. BAP1980). Federal Rule of Bankruptcy 8005 provides that a bankruptcy court has the discretion to grant a stay of its judgment, order or decree. The test is similar to whether a preliminary injunction should be granted. WCI Cable, Inc. V. Alaska RR Corp. 285 B.R. 476 (D Or. 2002).  The factors are (1) appellant is likely to succeed on the merits of the appeal, (2) appellant will suffer irreparable injury if a stay is not issued, (3) no substantial harm will come to the appellee, and (4) the stay will do no harm to the public interest.  Universal Life Church v. United States, 191 B.R. 433 (E.D. Cal. 1995).

*1. The Debtor is not likely to succeed on the merits.*

The Debtor has improperly framed the discussion as to whether the Debtor is likely to succeed on the merits.  From this Court's standpoint, the fundamental issue is whether the Debtor should be judicially estopped from proceeding with the contested confirmation hearing as a result of its agreement not to  proceed with said hearing, if it did not have $8 million on deposit on June 27, 2011, the start of the contested confirmation hearing.  The concept of judicial estoppel, a type of issue preclusion, is well settled in the Ninth Circuit.

In the decision of In re Haynes, 97 B.R. 1007 (9th Cir. BAP 1989) , the parties had been engaged in prepetition litigation in the state court.  During the course of a state court proceeding, counsel for the parties, Duane J. Dwyer and Dorothy L. Haynes, entered into a stipulation on the record regarding certain real estate.  The stipulation was **not** reduced to a written form.  Subsequently, both parties filed a bankruptcy case, and the issue between the parties was presented to the bankruptcy court.  The trial court discussed the concept of issue preclusion and judicial estoppel, and found that the parties should be held to their stipulation, and not allowed to relitigate the dispute, over and over again, in a variety of tribunals.  In

19

affirming the decision of the trial court, the Panel stated

> We find that the circumstances of this case are particularly appropriate for the application of judicial estoppel. Dwyer's and Haynes' agreement was stated by counsel on the record. Its terms were documented in the transcript of the hearing and affirmed by Dwyer and Haynes individually, not only verbally on the same record, but also by their subsequent conduct. Id. at 1012.

Although the facts vary somewhat in this matter, the principle is the same. The Debtor and its counsel were advised that the amount of $8 million, as proposed in the Debtor's plan, should be on hand at the time of the commencement of the confirmation hearing, or the automatic stay would be vacated to allow U.S. Bank to proceed with its rights and remedies under state law. To the extent that there was any confusion, the requirement to have $8 million, **not** $7,600,000, on deposit at the commencement of the contested confirmation hearing was finalized at the hearing in May 2011. Importantly Debtor's counsel, on behalf of the Debtor, agreed to that requirement at the May 2011 hearing. Debtor's counsel stated that he would not proceed with the contested confirmation hearing on June 27, 2011, and he would so notify the Court and the parties, if the Debtor advised him that the $8 million was not on deposit as agreed. The Court concludes, as a matter of fact and law, that the Debtor did not have $8 million on deposit at the commencement of the contested confirmation hearing. The Court and U.S. Bank were entitled to rely, and did rely, on the commitment and agreement of Debtor and Debtor's counsel.

The second fundamental issue is that the Debtor has potentially materially modified its plan, which would require that confirmation of its plan be denied. The denial of confirmation of the Debtor's plan also results in the vacatur of the stay in favor of U.S. Bank, as previously agreed to by the Debtor and Debtor's counsel at prior hearings before this Court.

The first modification of the Debtor's plan concerns, as previously outlined herein, the Debtor's opening of a second Escrow Account which purports to raise the funding for the Debtor and a related company, RCC South. The Debtor has made no request for administrative or substantive consolidation of these cases, and the secured creditors in the cases

are not the same. The Court has previously described the material changes as to how the Debtor will receive its funding. The investors are now able to review the plans in the RCC North and RCC South cases and decide if they wish a return of their funds. The investors may decide to direct their funds to the RCC North or the RCC South case. They decide. No one else. The investors may review the final order of confirmation as to the RCC North and RCC South cases and decide if they approve same. The investors have determined that if the confirmation of the RCC North and RCC South plans occur at separate times, there is an outside date for confirmation of September 30, 2011, at which point, the investors must consent, *in writing*, to have their funds retained in the Escrow Accounts. Since the Debtor has proceeded to proceed confirmation, at a contested confirmation hearing, on June 27, 2011, well prior to the hearing scheduled in the RCC South case, it seems certain that the outside date for confirmation of the plans of September 30, 2011, will be reached, and the investors will need to consent, in writing, to any additional time for confirmation of both plans. Thus, there are a number of additional conditions precedent that have been put in place that have not been disclosed to the creditors and interested parties in the RCC North or the RCC South case. The investors may withdraw their funds on deposit for both cases, if a number of events do not occur.

The second modification of the Debtor's plan concerns the stipulation that the Debtor entered into with Eye Level Holdings on the eve of the contested confirmation hearing, with no notice or disclosure to the creditors and interested parties in the Debtor's case. The Debtor now proposes to reject its lease agreement with Eye Level Holdings and enter into a new lease with it. The new stipulation between the parties provides that Eye Level Holdings will execute a promissory note to repay the Debtor the postpetition rent that is due and owing to the Debtor, and the Debtor will repay the unsecured claim it owes to Eye Level Holdings for tenant improvements on the current and additional space through the Debtor's plan. Why enter into such a stipulation? Eye Level Holding's not paying postpetition rent to the Debtor, in a lump sum at the time of confirmation, has a material impact on U.S. Bank, which has a perfected security interest on any rents received at the Property. In essence, the Debtor has made a one-

21

sided determination as to how U.S. Bank's collateral should be repaid to the Debtor.

11 U.S.C. §1127(c) states that "[t]he proponent of a modification shall comply with section 1125 of this title with respect to the plan as modified." Section 1125(b) does not permit solicitation of creditors or interested parties unless they receive a disclosure statement which contains "adequate information." Adequate information has been defined as that information which would allow a hypothetical investor typical of the claims or interests in that case from making an informed judgment about the plan. Thus, any material changes to a plan require that confirmation be denied, that the disclosure statement be modified to be consistent with Section 1125, and that the creditors and interested parties be resolicited for their votes. The Debtor has followed none of these procedures.

At a subsequent hearing, the Court offered to rescind its order vacating the stay and allow the stay to remain in place so that the Debtor could present evidence on whether its plan had been materially modified. The Debtor declined the offer.[44] As a result, the Court concludes that confirmation of the Debtor's plan must be denied, because it has made modifications to its plan, which appear material and for which the Debtor has refused to present further evidence. The stay must be vacated as a result of the Debtor's failure to confirm its plan.

---

44 On July 7, 2011, the Court conducted a hearing on the Debtor's Motion for Reconsideration of the Order Vacating the Automatic Stay. In essence, the Court proposed to grant the relief that the Debtor requested, but cautioned Debtor's counsel that the Court needed to conduct a hearing on whether the plan had been materially modified before it could proceed with the Debtor's contested confirmation hearing. Debtor's counsel was concerned that U.S. Bank would proceed to confirmation of its plan first, and that the Court's offer to conduct further hearings would not assist it. The Court then inquired whether Debtor's counsel wished to withdraw the Motion for Reconsideration. After a discussion in the hallway with his clients, Debtor's counsel returned to the Courtroom, and withdrew the Debtor's Motion for Reconsideration. At the hearing on July 11, 2011 on the Debtor's Motion for Stay Pending Appeal, Debtor's counsel and the Court had a different recollection of what transpired at the end of the hearing on July 7. The Court has since reviewed the transcript from the hearing. From the Court's standpoint, it was Debtor's counsel that stated that the Court's offers would not assist the Debtor, which led the Court to inquire whether the Debtor wanted to withdraw the Motion for Reconsideration. The Court allowed the Debtor and its counsel to leave the Courtroom to consider what they wished to do. Later Debtor's counsel returned and advised the Court that he wanted to withdraw the Motion. The Court concludes that Debtor's Counsel chose that course of action.

The Debtor has no likelihood of success on the merits, inasmuch as the Debtor has not placed on deposit the amount of $8 million that is necessary for the Debtor to proceed toward a contested hearing on confirmation, and the Debtor has refused to present any further evidence to the Court on the issue of modifications of its plan.

### 2. *The Debtor will not suffer irreparable injury.*

The Debtor's recent opening of the second Escrow Account, without notice to the Court, U.S. Bank, or the creditors of this estate, clearly reflects that the investors no longer are solely focused on this Debtor or its Property. Indeed the investors can direct how their funds will be invested, they can review the order of confirmation as to the plans in the RCC North and RCC South cases, and they can wait to see if the final orders of confirmation in both cases are in place by September 30, 2011. If any of those events do not occur, the investors may withdraw their funds–no penalty, no problem. Such an approach by investors to four separate buildings, in two separate cases, with two different secured creditors clearly shows that they are not committed to any one debtor, nor to any one building or buildings. Such a record reflects no irreparable injury.

### 3. *U.S. Bank will suffer substantial harm.*

The Debtor has not clearly described the harm to U.S. Bank. As noted previously, U.S. Bank is promptly moving toward confirmation of its plan to provide some return on investment to the certificate holders who provided this Debtor with substantial funding. What the Debtor desires is not to preserve the *status quo.* By requesting that the Debtor's Chapter 11 proceedings be suspended, or that the motion for a stay pending appeal be put in place for at least 30 days until an appellate court may hear the matter, the Debtor is really precluding U.S. Bank from proceeding with its scheduled trustee's sale of the Property, **or** precluding U.S. Bank from confirming its plan, which has no impaired creditors, and which may apparently be promptly confirmed under Section 1129(a). Since this is the battle of the investors of the Debtor and U.S. Bank, the Court concludes that prohibiting U.S. Bank from proceedings with its rights and remedies in this case, at this time, is substantial harm to U.S. Bank. The

23

Debtor has had ample opportunity to proceed toward confirmation, and it has not succeeded. U.S. Bank should not have to incur further fees and costs and delay, adversely impacting its certificate holders, when it has a clear path for some recovery on the debt that is due and owing to its investors.

*4. A stay pending appeal will do harm to the public interest.*

The United States Supreme Court decision of <u>Bank of America Nat'l Trust and Sav. Ass'n v. 203 LaSalle Street Partnership</u>, 526 U.S. 434, 119 S. Ct. 1411, 143 L.Ed 2d 607 (1999) is instructive on this issue. Although the Supreme Court did not answer the question of whether the new value exception or corollary to the absolute priority rule survived the enactment of BAPCPA, the Supreme Court concluded that confirmation of the debtor's plan would be denied, because the debtor had not exposed the value to be provided in the debtor's plan to the market. The Court stated that the debtor could hold an auction to determine the value of the interests held by old equity or prior interest holders, or new investors in the debtor, or the debtor could permit another party in the case to file a competing plan of reorganization. The market place would establish the value that had to be paid by the new or old equity or interests to retain or receive an interest in the reorganized debtor. The market place would determine whether the debtor's plan should be confirmed at all, or whether a competing plan of reorganization should dictate what would happen in the case.

Public policy, in light of the analysis in the decision of <u>203 N. LaSalle Street</u>, clearly supports allowing the competing plan of reorganization of U.S. Bank to proceed toward an uncontested confirmation hearing under Section 1129(a). The Debtors' proposal to suspend the Chapter 11 proceedings, or allow a stay pending appeal to be in place for 30 days, effectively derails U.S. Bank's ability to proceed on July 27, 2011, at its hearing on confirmation. There is no basis, in law or fact and on this record, to permit one group of investors (the Debtor's investors) to enjoin a second group of investors (the U.S. Bank certificate holders) from recovering on its investment.

<u>B. Suspension of Proceedings or Imposition of 30-day Temporary Stay</u>

Pursuant to 11 U.S.C.§ 305(a), a Court, after notice and hearing, may suspend all proceedings in a case under this title, at any time if the interests of creditors and the debtor would be better served by such dismissal or suspension. In re Eastman, 188 B.R. 621 (9th Cir. BAP 1995). Section 305 is considered an extraordinary remedy. Section 305 appears to only be applicable if both the creditors and debtor would be better served by the remedy. Before a court may refrain from exercising jurisdiction over an otherwise proper case, it must make specific and substantiated findings that the interests of the creditors and the debtor will be better served by dismissal or suspension. In re Spade, 258 B.R. 221, 225 (Bankr.D.Colo.2001), aff'd, 269 B.R. 225 (D.Colo.2001). Given the extensive findings of fact and conclusions of law in this decision, the Court sees no basis to grant the Debtor's request to suspend these proceedings.

The Debtor also requests, in the alternative, that the Court grant it a 30-day temporary stay to allow the Debtor the time to file a Motion to Stay Pending Appeal to the appellate court. The Debtor has not provided a legitimate basis for the imposition of such a 30-day stay in this case.

In any event, at oral argument on the Motion for Stay Pending Appeal, the Debtor and Debtor's counsel no longer seemed interested in pursuing a 30-day temporary stay, or even a 7- to 14-day stay to be issued by this Court. Counsel for U.S. Bank notified Debtor's counsel that the appeal of the U.S. Bank Order Vacating the Stay had been referred by the Ninth Circuit Bankruptcy Appellate Panel to the Arizona Federal District Court, so the concern of Debtor's counsel that some type of an interim stay had to be issued by the Bankruptcy Court to allow the Debtor the time to be heard as to whether a stay should issue from an appellate court prior to U.S. Bank conducting a trustee's sale of the Property was no longer a matter that needed to be considered by this Court.

IV. CONCLUSION

Based upon the Court's analysis of the issues presented in the Debtor's Emergency Motion For Stay Pending Appeal and Suspension of Chapter 11 Proceedings Or, Alternatively Motion To Extend The Stay for 30 Days To Seek a Stay Pending Appeal From the

25

1 | Appellate Court, the Court concludes that the Debtor's Motion must be denied in its entirety.

2 | The Court will execute a separate order incorporating this Memorandum Decision.

3

4 | DATED this 12th Day of July, 2011.

5

6

7

8 | Honorable Sarah Sharer Curley

9 | United States Bankruptcy Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28